Next case this morning is case number 4141109, Richard Lee Van Dyke v. Jesse White et al. For the appellant we have Bill Hardy and for the appellate Christopher Turner. Mr. Hardy, are you prepared to proceed? Thank you. I please the court, counsel. Your honors, my name is Bill Hardy. I represent the appellant in this case, Richard Van Dyke, who is also here today. Mike Moorhead is the attorney who tried the case in the administrative agency. This case should be reversed for two basic reasons. First, there's no jurisdiction. The Department of Security, the Security Department, has never had jurisdiction over annuities issued by insurance companies authorized to transact business in Illinois. All of these transactions, there are 21 insurance clients who purchase replacement annuities, all governed by the insurance code. There is nothing in the Securities Act that grants the Department of Security the authority to do this. How about that section 12J? 12J applies only if he is acting as a registered investment advisor when he does this. There's no evidence he was acting as a registered investment advisor. All of these people were insurance clients. And we point this out in our reply brief in some detail where the Department, the Securities Department, says and tries to hang its hat on 12J and say, well look, look at these documents where there were three or four clients where he actually had agreements and he was acting as an investment advisor for them in 2005, 2006, 2007. Some of these clients testified that they came to him earlier. They had stocks. They had securities. They wanted to sell those. So he sold those and he facilitated the purchase of annuities. But all of those documents relate to things that happened during a completely irrelevant time period. They have nothing to do with the replacement annuities. These are straightforward insurance transactions. As we pointed out, the only client that had any kind of securities arrangement with him was Jimmy Clee. And that was a $1,975 fee that he paid. And then the replacement annuities that are at issue with respect to Mr. Clee are like the following year. So in order to retain a fee, did that cover just a year or was there a time? I don't think there was a time period. But again, you have to be acting as a registered investment advisor. And as we point out in our brief, when you look at the definition of a registered investment advisor, you have to be doing something in connection with securities. Now, only a licensed insurance producer can sell these kinds of annuities. There's no question about that. Only a licensed insurance producer can give any advice or recommendation. It would be a violation of the securities code for an investment advisor to even provide advice about that. Only a licensed insurance producer can do that. And the reason for that is simple. Because for 90 years, annuities issued by insurance companies authorized to transact business in Illinois have been excluded under the Securities Act and they've been heavily regulated by the insurance department. Period. There are extensive regulations that deal with suitability requirements, with the training that insurance producers have to go through. Every conceivable aspect of these annuities is regulated by the Department of Insurance. And these annuity contracts are defined under the insurance code as insurance products. So there is simply nothing in the Act. The only regulation that they claim was violated is 130.853. Now, that's in our brief. It's in our appendix at A77. 130.853, account transactions. Affecting or causing to be affected or for any client's account any transactions or purchase of sale, et cetera, et cetera, which are unsuitable. Any client's account, singular. Now, we put an extensive analysis in our brief about how this has to be considered in context with the regulations around it. This deals with securities clients who have given authority to an investment advisor to make trades for them or to deal in securities. For example, I mean, what we have in this case, the department's auditors went in because of a complaint that apparently related to the Klee file. What was that complaint? Well, it's not clear from the record. It's the only person to testify to it. I mean, we don't find out who makes those complaints. The only person to testify about it was Mr. DeWitt. And I think from the testimony, it appears to be one of the children of Mr. Klee. Well, do we know if the complaint even pertained to annuities or whether it pertained to some other type of securities? We don't even know. We don't even know what dealt with it. But we do know that Mr. DeWitt, when he reviewed the files, only found insurance transactions. That's what he testified to. So after they looked at the Klee files, they looked at the three clients where he had securities clients. He had three clients where he managed their portfolios. And, you know, you look at the Securities Act, you can give discretionary authority to your financial advisor to make trades. And that's what this is talking about. You make a whole bunch of trades in an individual's account, make a whole bunch of commissions, and it's not in their interest or it's unsuitable. That's what these regulations are designed to deal with. But they have nothing, not one iota, to do with an annuity contract, which is expressly governed only by the Department of Insurance regulations. Absolutely nothing. With regard to the Department of Insurance, they also filed charges in this case, did they not? They did. That's correct. And there was a consent order in here? There was a consent order with no admission of liability where Mr. Van Dyke agreed to pay $6,000 with respect to various forms that were filled out, allegedly incorrectly. Did the Department of Insurance determine that the annuities sold here were unsuitable for Van Dyke's clients? They did not. They did not. They did not. The consent decree basically... So as I understand what you're saying, the Department of Insurance has rules and regulations regarding the sale of these types of annuities. Absolutely. They filed a charge. They did not find that these were unsuitable. And yet the Department, in the case that we're here on today, did find these unsuitable. That's correct. They found they were unsuitable in a one-sentence conclusory finding, which is the same finding that's alleged in the notice of hearing, about how it's unsuitable based on their age and so forth. But the suitability requirements... What's interesting about this is the Department presented the testimony of Susan Lamb, the Department of Insurance actuary, and asked about those suitability requirements. And so what are they? And they're detailed. They're in our brief. They're in our appendix. But you have to look at the individual circumstances of the client. You have to compare the old annuity to the new annuity. And there's a 36-month period where you have to apply more factors. If the surrender is within 36 months, none of these things... Mr. Lurie, am I correct in reviewing the record that Mrs. Lamb testifies as to how it's determined whether a policy is suitable or not suitable, but yet no one ever asked her the question whether these particular policies at issue were suitable. I don't understand that. I don't understand it either. I don't understand it either. Now they say in their brief, look, this is not about the Department of Insurance. It's not about the Department of Insurance regulations. We're not alleging that Mr. Van Dyke violated those regulations. We're alleging that he violated the securities code. And I don't know how you can possibly analyze this other than to look at what he was required to do as a licensed insurance producer. He was required... These individuals testified. They testified that they believe... They were happy with their annuities. I mean, 14 of the 21 testified. Four were subpoenaed or called by the securities department. The best they were able to get out of one or two of them was, well, do you recall whether or not he said anything about surrender charges? No, I don't remember. It was four years before. My gosh, that's fraud? That's it. That's the sum and substance of their claim. It is. Mr. Moorhead called it smoke and mirrors. That's exactly what it is. They came up with this aggregate analysis. It has no bearing whatsoever to the rules, even their own rule. If you want to stretch that and say it applies somehow or another, well, you have to do an individualized analysis. What was the evidence relative to the financial detriment to each of the clients? Spreadsheets that were prepared by an auditor who was directed by the prosecutor how to prepare those spreadsheets. He was directed not to include the bonus features, the bonus amounts in there when calculating the loss. When asked about that on cross-examination, and he's not a securities expert, by the way. He doesn't have a license in securities. He knows nothing about insurance products. He's an auditor. He has a two-year degree from Lincoln Land in accounting. He prepared these spreadsheets. When we asked, well, why didn't you include the bonus features? Why didn't you include the bonus? Well, because I was instructed by the prosecutor not to because the department, the securities department, doesn't consider a bonus as a reason for switching annuities. Well, the Department of Insurance witnesses all testified universally. Sure, you can consider that. And you can consider the market value adjustment. So was any evidence of that nature presented as to including those in the calculation and what effect that would have? Well, Mr. DeWitt went through these, testified about all of these spreadsheets that he prepared. But he admitted, just like Dr. O'Neill did, who, by the way, is not an expert in securities, not an expert in insurance. He's a finance guy, electrical engineer, who went on and got a Ph.D. in finance from another state. He comes in and he looks at 10 to 15 pages of these documents and he says, these were not in their best interest. Now, 19 of those clients, I mean, you can look at those spreadsheets. And those spreadsheets, the whole problem with it is this case should have been dismissed as soon as there was the admission that there's no individualized analysis here. You can't just, it would be like someone making a complaint against me because I charge too much in breach of contract. So they come in, the RDC, and they look at it and they say, well, that's fine, but I'm going to look at all your other breach of contract cases. And so they look at it, they hire some expert to say, oh, the average case, you charge too much for this, so therefore this is fraud. That's the sum and substance of what this is. I mean, absolutely no individualized analysis. You know, O'Neill testified, we laid out in our brief in some detail how those numbers were no relationship to reality. He came up with these projections for four people, okay, specific projections. The account statements were put into evidence by the department, okay. The account statements show that the amounts that they received far exceeded the projections on the new inquiry. And it's because you have the bonus feature adds to the amount. There were different index strategies. They had different options. These annuity contracts are contracts of insurance. You see those binders in your yard? There are seven binders. Those are the 5,000 pages of documents that they're talking about. Oh, the secretary submitted 5,000 pages of documents and determined documents and determined that these were not suitable. Those are all insurance contracts, with the exception of some of the various spreadsheets, some comparison documents that Mr. Van Dyke prepared, and regulations, which are about that thick. These are all insurance contracts. They're contracts signed by these 21 individuals saying that they are aware of the surrender fees. The documents that were sent to the clients specifically disclosed what the MBA was, specifically disclosed what that surrender was, specifically disclosed what the surrender fee charge was. Now, here's what they did in this case. I mean, what's ironic about this, and I don't say this lightly, the securities department fabricated a fraud claim using an analysis that has no basis whatsoever in Illinois law, and then proceeded to have it rubber stamped by an ALJ who has never ruled against the department, ever. 66 decisions. I was so outraged by this, Your Honor, that I looked at every decision decided by this guy, every recommendation. There are 66 of them. Not one of them does he recommend against the department. 26 of those involve the same prosecutor. Now, there's only two cases, this case and another case by the same prosecutor involving senior financial strategies. That was a case decided after my client was charged. That's a case where they basically presented the same aggregate analysis and fined two financial advisors $10,000, $5,000 apiece, for allegedly fraudulently selling the same types of annuities to 12 insurance clients. Yet, in this case, they rubber stamped $330,000 of fines against my client. I mean, Your Honors, I am aware that all three of you are former prosecutors. You were elected as the state's attorney. You served as part-time. That was your first job, Justice Holderwhite, as an assistant state's attorney. You know what it's like to prove fraud. You know the gravity of that. When you allege fraud against someone, fraud against the elderly, they have destroyed this man. They have destroyed his reputation. They have destroyed his insurance business. He had 125 insurance clients. There's no evidence that any of them were dissatisfied or that any of them made a complaint in this case. Yet, the Department of Security comes in with this bogus analysis by O'Neill, which bears no... Well, am I correct? Well, you said in your brief, I want to make sure I'm understanding this, when O'Neill was asked questions about insurance products, the prosecutor objected, saying there's no foundation. He's never been certified or testified that he's an expert on insurance products or, you know, familiar with them. I'm not sure if that was O'Neill or I thought that was DeWitt. Am I incorrect about that? I think it was O'Neill. Maybe it was O'Neill. But that's true. That's true. I don't understand. How can he be an expert on these annuity contracts if he admits he knows nothing about insurance products? I don't know either. I have no idea. But the worst part about this case is you have 21 people who came in and testified, or not 21 people who testified, but 14 of them testified, and we laid out the testimony in our brief. I mean, you have people who came in and said, oh, he explained everything to me thoroughly. We went home. We thought about it. We considered it. We knew what the surrender fees were. We knew what the MBA meant. We were explained that. It was in the contracts. We read the contracts. We talked about it. Me and my husband talked about it. We love Dick. He's a great guy. He took all this time to explain all this to us. They don't believe they were defrauded. This is the first time in the history of this state that I'm aware of where an administrative agency has come in and said, these 21 people were sold fraudulent policies. They lost money. And all of them said, no, I'm happy with these annuities. Well, not all of them. Some of them didn't even testify. Three of them were deceased. What did they receive? They received, their beneficiaries received death benefits that were higher than the old annuities. Why? Because they had the enhanced death benefit. I mean, this is just. Just explain this to me. How does a commission get generated from the surrender of a policy? Because the way I read it, what happened here is Mr. Van Dyke had client surrender policies, and he got a commission in doing that, then having them buy the new policies, he also got a commission doing that. Is that right? No, that's not correct. He got the commission for selling the replacement annuities. He did not get the commission for selling, for surrendering the old annuities. He got $160,000 in commissions for marketing the replacement annuities, the 33, as I understand it. Putting aside whether it was a commission, was there any financial benefit to Mr. Van Dyke in the surrender process? Not that I'm aware of, no. I mean, the surrender process. And, you know, there was all this testimony about. Well, where does the department come up with the $307,000 in commissions? Because didn't you just say it was only $160,000? Well, they added in the commissions that he got from the sale of the original ones. And, of course, but that was years ago. I see. But there are no allegations that he did anything wrong with respect to those. And so, you know, I've been struggling with how they came up with this. There's this 3M argument about how they have jurisdiction. It's exempt from registration, but we still have authority over them. That's why there's so many people coming in here saying, hey, this is crazy. Because if they find that he's acting as an investment advisor by selling these annuities, then every insurance producer out there is going to be subject to this prosecutor over here. And, you know, it's. Well, to extend that, I mean, it sounds like you're describing a situation where people come to this person saying this is what I want to do, I want to make a change or whatever, and then they're looking at being penalized or being accused of being fraudulent in honoring the wishes of the holders of these investments. Well, they are not claiming they were defrauded. That's what I'm saying. Right. They are not claiming that. But they are claiming that he committed fraud by marketing these things. Right, and what I'm saying is, let's say that I'm one of those people, and I go to him and I say, look, I want to surrender this and I want to get something else. Are we putting him in a situation where he's honoring the wishes of the holder of these investments and he's being accused of doing something fraudulent when he's simply honoring their wishes after explaining everything to them? I see that I'm out of time, but I'd like to answer your question. Yes, I mean, absolutely. The individuals are being put in impossible positions. But I should say this. He still has to do the suitability analysis. He still has to compare them and recommend it, which he did. And when you look at the suitability forms, as we know from our reply brief, all these people were different. Some of them never wanted to surrender the new policies. They wanted to pass them on to the beneficiaries, which makes the death penalty very important, makes the bonus very important. Yet they didn't perform any individualized analysis. I would ask this Court to give this man his life back. Give him his life back. He spent a fortune defending this case, and it is absurd. Mr. Hardy, you will have rebuttal if you so choose. Mr. Turner. Good morning, Your Honor. Good morning. It pleases the Court. I'm Christopher Turner, the Assistant to Illinois Attorney General here on behalf of the appellee, Jesse White, the Illinois Secretary of State. This Court should affirm the Secretary's final administrative decision in this case, finding that the appellant Richard Lee Van Dyke violated Section 12 of the Illinois Securities Law when he recommended and facilitated these 33 replacement new annuities for the legacy annuities. Now, this appeal revolves around certain complex financial contracts. They're hybrid contracts called equity-indexed annuities. They have aspects of an annuity, a traditional annuity. That is, they provide minimum guarantees, and they also have aspects of securities. That is, they provide a higher return based on the future performance of a stock index. Now, this Court should affirm the decision because the Secretary did not err both in finding that Mr. Van Dyke did act as an investment advisor when he recommended and facilitated these sales. Now, we also argue that these are securities within the meaning of the Illinois Securities Law. I don't call that the act. However, you do not need to reach that decision if the Court doesn't want to because it is enough that he was acting as an investment advisor. But an investment advisor can't sell these insurance products. It takes a person with a license issued by the Department of Insurance, doesn't it? While it requires a producer's license from the Department of Insurance, an investment advisor certainly can sell these if they also have that insurance producer's license. There is no objection. I think I just said that, didn't I? Correct. You can be an investment advisor and acting as an investment advisor, sell these products that are regulated. There was no problem with him wearing both hats, correct? Correct. He can wear both hats, but when he's wearing both hats in the transaction, he is also subject to Section 12J of the Securities Law. That is, if he's acting as an investment advisor. To me, it's a simple question. Why doesn't the Department of Insurance regulate this and the Securities Department regulate securities? To me, I don't know. Maybe I'm just too simple. That makes sense to me. Well, there's nothing unique or strange about having the same transaction or the same financial instrument regulated under more than one regulatory regime at a time. Whether it's if I have an interest in an orange grove somewhere, besides the agricultural kind of regulations, it's going to be under the Commodities Commission, my financial interest. It could also be regulated under the securities laws. These types of investments, these annuities, are sold in virtually every state, correct? Correct, Your Honor. Every state has its own Department of Securities and also their own Department of Insurance. Is that right? Correct, Your Honor. Is there case law suggesting supporting the Department's actions here and encompassing this type of investment vehicle as a security to be regulated by that state's Department of Securities? I don't know any state authority going either way, Your Honor, in other states on these. I did cite there's plenty of federal authority, which we rely on. Some of it looking at variable annuities. Some of it looking at other hybrid annuities similar to the equity index annuities. And then there's a D.C. Circuit decision looking specifically at equity indexed annuities. And all these decisions found these hybrid financial contracts to be securities with the meaning of the Federal Securities Act, which our definition of securities and investment contract has been patterned on. They look at it because if you look at the economic realities of the hybrid contract, that is, does it raise the economic realities of that contract? Is it raising the kinds of concerns that are addressed by the securities laws? And when it's something that is being sold by its very nature based on potential future investment growth, that is, how a stock market index will perform in the future, then it raises those concerns. And those economic realities cause for it to be subject to the securities laws as well as insurance regimes. In the Supreme Court case that we cite, the SEC versus United Benefit Life Insurance, that looked at a hybrid vehicle. It was called a flexible annuity fund. It had aspects of a variable annuity where it had accounts and investments, but aspects of a traditional annuity as well because it provided minimum guarantees. The court there found that even though it provided those minimum guarantees, still because it also was providing potential growth based on future performance of investments, that it was a securities, an investment contract. I thought variable annuities were considered securities. They are, Your Honor. Correct. Okay, and you just said in that case it had some sort of consistency with a variable annuity, right? The court never referred to it as a variable. It actually said it had some characteristics of a variable. Let me ask you this. In his brief, the Department of Insurance has enacted detailed regulations addressing the suitability factors insurance producers and insurance companies must adhere to when offering or selling annuities or replacing them. And then he goes on to say the securities department, however, by comparison, does not have a single regulation or rule with respect to such annuities. Well, it sounds like the Department of Insurance would have the superior expertise. No, Your Honor, they don't have any superior expertise with regard to... Well, at least they have rules and regulations to follow. But that doesn't decide whether or not under the statutes, I mean, whether that transaction or that instrument is securities within that meaning of the statute. I just want to clarify something with regard to the code. First of all, we don't dispute that the insurance code covers these equity index annuities. That is, that they're subject to the insurance code. There is no provision in the code itself specific to equity. It just treats it as another annuity. Now, also, the regulations under the code, that's where the suitability standards are that they were referred to. But those also are not specific, those regulations aren't specific to equity indexed annuities. They govern any annuity sale. And these are considered annuities under the code. Therefore, they're subject to these provisions. Now, you can look at these provisions. They've got, yes, they've got the suitability standards under, I believe it's Title 50 of the Administrative Code, Section 3120.40. That's the definition. It just lists, basically, the suitability standards. The factors, like looking at what is the financial condition of... Well, your own witness said you had to consider the policies to determine whether they were suitable for the individuals who purchased them. That was your witness, correct? And she said that... And your other witnesses said they did not do that. They specifically did not look at the policies. No, well, they looked at aspects of the policies in order to... What they did is they didn't look at all the policies and all the different features. But the suitability standards and those features are not a shield against a fraud claim. That is, it's a standard which simply requires... Look at 3120.50a, subsection a, which says it requires the producer, when they're selling an annuity, to consider whether it's... To make sure they have reasonable grounds to believe that it's suitable for their client that they're selling it to. It is a bare basic... It's a floor affirmative duty to make sure, looking at these various factors. Now, first, the fact that there's a floor affirmative duty does not make that inconsistent with having a higher duty as in being, for instance, as an investment advisor in the fiduciary duty of their clients to make sure it's in their best interest. But beyond that, there's nothing inconsistent between 3120.50, subpart a, and the suitability duties that it's applying, and the findings of fraud here. What do they do? They require disclosure of the basic features like the surrender charges, the future... Sorry, the annual fees. Those are the kinds of... Those are exactly what the secretary found there was insufficient disclosure about. And then the subsection 3120, subsection a, subsection four on replacement transactions like these here, it says you have to make sure that you consider what aspects does it list? It is. It says whether you consider the surrender charges that are being imposed for that replacement transaction, the new longer surrender period that the new annuity is going to be subject to, any increased fees. These are all exactly what the court... Sorry, what the secretary found below were wanting, were the reasons because of these additional surrender charges that were being imposed, because of the new surrender period, because of the increased fees, and because of the lost benefits, that is the lower minimum guarantees in these new replacement contracts, that they were not in the best interest of those clients. Just a point of clarification. Let me just ask briefly. Just as a point of clarification, did Mr. Van Dyke share in any of the surrender charges in any way? No, he doesn't receive any of the surrender charges. Thank you. Now, Mr. Hardy seems to question whether or not there was any financial detriment to these investors and specifically the evidence that was presented and the lack of consideration of the bonus. What is your response to that? Do we have a clear picture of truly whether or not there was detriment? Yes. Both from the auditor, DeWitt, and also from the financial expert, O'Neill, there's evidence from both of them on the financial detriment suffered by the clients. First with DeWitt, he did provide a number of looking at all the losses imposed, the surrender penalties imposed on the contracts in these transactions. There's two sides of these transactions. You're surrendering and then you're replacing them with a new annuity. He did have a number that excluded the bonuses, $297,000, but he also added them up including the bonuses as well. I think it was over $90,000. He gave both of those numbers and provided both of those assessments. He also testified about the reason why. He did, not specifically when he gave the $90,000 versus the $297,000, but he testified he looked at the bonus contracts, 11 of the new contracts which had bonus features. What they provide with them in addition to something called a bonus recapture, that is if you surrender early, they take back the bonus. They provide increased annual fees directly tied to taking that bonus. Then he projected out those fees year after year forward. I think it was nine years out. Those fees had already, for all the contracts, exceeded the bonus itself. That's why they were giving the new numbers because he said, yes, you're getting these bonuses, but if you're actually going to hold on to these contracts, those bonuses are basically being taken back in increased annual fees. That's why under the department's position that those bonuses really in some ways should not be counted. But they gave both numbers. In addition, O'Neill provided his analysis of the contracts. He gave a composite analysis which did look at all the contracts, taking that contracts, looking at their financial condition from day one, and then projecting about 25 years forward. In that one, he looked at and he found for the average contract, would the new annuity, the value of that exceed the legacy annuity that it replaced? But he found that no, the average legacy annuity 25 years forward always had a higher value. Now, he didn't include the bonus in that either. That was the reason he gave, because the bonuses are usually subject to recapture and annual fees. O'Neill used projections. But Van Dyck says in his brief that the projections have been proved wrong. And I don't see where you responded to that in your brief. We do actually directly respond to it. O'Neill specifically did not. He testified that he was providing a projection board. He was assuming a 3% credited return. He wasn't going to speculate in how the performance of the broad stock markets would go forward. And if he had been asked this, they never tried to actually cross-examine him on any of those. The reason is simple. It's because to the extent that the new annuity would go up with the stock market, so would the legacy annuities as well. He specifically testified, look, the quantitative number, the exact number based on what will actually happen, I don't know, but the qualitative assessment in comparison to the value of the two contracts is going to remain the same. He gave testimony that was in direct response to that criticism. And we argued that in the brief, Your Honor. It's because these annuities going forward, no, this was going from 2000, they bought these in 2000, 2009, 2010. And then the numbers, the statements that they put in from 2012, we all know what happened. It was right after the Great Recession. There was a huge stock market appreciation during that two-year period. And yes, they had higher numbers. And that was the reason they had higher numbers is because the stock market went up. But that stock market effect would have affected both the original annuity and the new annuity. And they would have, so when we're making the comparison, the losses that they suffered from the surrender. Well, at least one, if not more, of these clients approached Van Dyck and said, we want to get rid of these ING annuities. That's what we want to do. And so he sold them the new annuities. Now, how can that be fraud if they approached him and asked him to do that very thing for them? He should have just said, I'm not going to do it because I sold you the original one? First of all, I'm not sure if I agree with that characterization. There were different testimonies. There was one witness who I think was worried about ING itself. Some came just saying, I want to make more money. Others, he came to them. I think the one was Perry for sure. How can that be fraud and how can he get slapped with a $10,000 fine when Perry comes to him and says, I want to get rid of this ING annuity? When Perry comes to him and says, I want to get a new annuity, then he is under an obligation to make sure that the replacement transaction that he's going to recommend to him and that he's going to facilitate is in his interest. If he's found one which is actually in their interest with some new annuity or some other new investment, that's the obligation is to make sure it's in his best interest and to make sure that he has full disclosures about the extent to anything that might not. For instance, the higher fees. For instance, the surrender charges and their impact on the future value of that new annuity. That going forward, you're going to get a new annuity, but it's probably not going to exceed the value of your old annuity at least for 10 years or more. And what if the person says, that's fine, I still want to do it? At that point, you might not have fraud. If he's going to facilitate, it needs to be in their best interest, but you don't need to reach that question here whether or not he could ever recommend it. You would at least have to make sure that he has full disclosure about the negative aspects of it when it's not in his client's best interest at the very least. And that's what the Department of Insurance investigated, charged, and ultimately settled with him on. On that very issue you just talked about, right? They settled on the claims against him, yes, Your Honor. But that doesn't show any outcome. That doesn't show that they didn't believe that he had violated the code. In the notice that was originally sent just before the charge was filed, in paragraph 18 it stated, under Illinois law, indexed annuities are securities subject to the Act. What was that? That's section 2.1 of the Act, that they're investment contracts, Your Honor. 2.1 says that indexed annuities are securities subject to the Act? Yes, it defines what annuities are. I'm sorry, I misspoke, Your Honor. It defines what securities are. It has a broad definition with a long list of different kinds of transactions, interests, and instruments which constitute a security, including investment contract, and it is included as an investment contract within security. So it is securities within the meaning of 2.1 of the Act. For me, when he says Illinois law, I was expecting that there's some case that backs that up. What interpretation of it? Well, there's no case addressing equity indexed annuities, but to put forward in an allegation or a notice of hearing like that, a complaint, you have to put down that you have a specific authority in support of the case that you're making. Well, except for the phrase, under Illinois law, it was basically adopted, both by the hearing officer and ultimately by the department. And it is under, Your Honor, it's under Section 2.1 of the Act, but it's certainly as it has been interpreted by the Illinois Supreme Court, the Dalladin decision versus Wiggins Oil decision, which provides the broad and flexible definition of investment contract, which Illinois has adopted, and should apply to any sort of scheme in order to obtain money on the promise of profit when you want to invest it in a common enterprise based on the promise of profit. And that's exactly what these financial instruments are here, Your Honor. So that it is subject to the Act. Sorry, it is a security subject to the Act, and we also looked at the federal law, which also supports that. The securities definition is patterned on the Federal Act, particularly the notion of the investment contract is patterned on the Securities Act, on the Federal Securities Act. And the Federal Securities Law, sorry, the federal courts have looked, at first it was variable annuities, like you said, but then since then they've looked at other types of hybrid contracts with minimum guarantees, just like the equity indexed annuity. And they have consistently found that each of these, because of the component of offering the higher profits based on future investment performances, that renders it a security. The economic realities of that show that this is going to raise the kinds of concerns that the securities laws are intended to address. Now, going back to your question about the dual regulation, there's nothing wrong with, it's consistent with the Illinois securities law, that you're going to have aspects, particularly the registration of the issuer, I'm sorry, of regulating the issuer themselves of these contracts, of the issuance of the product themselves, all those are covered under the Department of Insurance. It's regulations in the insurance code, because that's under the exemption of Section 3 and Section 3M. That instruments, sorry, debt instruments, or any kind of financial instrument that's issued by a regulated company, a company I regulated as an insurance company under the state, that it is exempt from the registration requirements of the Illinois securities law, but that doesn't exempt it from 12J. And this has always been the way it's been considered. We sell you back, actually, to the original, the interpretive comments, which were written by the architect, and were actually relied upon by the Illinois Supreme Court when it was interpreting the definition of securities in an investment contract. And he even says there, and we cite to it, that even when you have an exempt insurance product, that it can still be subject to Section 12J and the anti-fraud provisions of the Act. And that's because those kinds of high-value products, if they're both a security and also still regulated as insurance, they're going to raise the kinds of considerations specifically that we're worried about and are pertinent to the anti-fraud provisions. Thank you, Your Honor. For the reasons set forth in our briefs, we ask that you affirm the decision of the final administrative decision of the Secretary. Thank you, Mr. Turner. Mr. Hardy, do you have any rebuttal? Yes, Your Honor. Variable annuities are specifically excluded under Illinois law. We cited that statutory provision in our brief. What they say is we forfeited the argument because we didn't specifically cite that argument when we were arguing that there's no jurisdiction, no regulations, no authority whatsoever and so forth. It was first cited by amicus. But they don't dispute it. Variable annuities are specifically excluded and within the sole jurisdiction of the director of the Department of Insurance. Now, all this talk about federal law and investment contracts, I mean, we have an exhaustive analysis in my reply brief about that. That wasn't the analysis. They were saying this was a face amount certificate. You review that record, you're not going to find any testimony from anybody that these are investment contracts. The only place where annuity is even mentioned in the Securities Act is under face amount certificates. It has absolutely, there's no evidence whatsoever that these are investment contracts. And they cited regulation that deals with investment contracts, which was not cited anywhere in the motion here. It was never mentioned during the testimony. Yet, they made that their central argument in the trial court. These aren't investment contracts. And the dual regulation, look, there could be dual regulation. There's no doubt about it. Let's say, for example, that they were charging him because they found that in one of these annuity transactions, he did sell the stocks, like back in 2005, 2006. He was acting as a registered investment advisor when they came to him and said, look, I want to sell these stocks. I want to get out of the stock market. I want to sell these. So he helps him with that. He gives him advice on that. But then after that, he sells them an annuity as part of that transaction. Let's say they said there was something wrong with what he did with respect to those securities. Well, then there's dual jurisdiction. But this case involved 21 insurance contracts. They're all insurance contracts. It has absolutely nothing to do with securities. And to your point, you asked questions about the regulations. I'm not quite sure I understood what Mr. Turner was saying there, but he was referring to the insurance code. The only argument he was making was the suitability analysis under the insurance code. Yet they say in their brief, look, we didn't charge him with that. We charged him with violating Section 130.153. Well, which is it? So now they're saying, oh, we proved that there was a violation of the insurance code? I mean, it's not there. It's nowhere in the record. There's no testimony at all. Section 2.1, it contains a long list. Again, Section 2.1, again, it's a face amount certificate. It's the only place it's mentioned. Detriment to the client, Justice Holder-White, you asked about that. What he said was, well, we had Mr. DeWitt and we had Mr. O'Neill testify about these aggregate losses. We lumped them all together. We didn't consider the individual features of the annuities. He says, well, wait a minute. We argued in our brief that, hey, it would have been that much higher under the old annuity. There is no evidence whatsoever in the record to support that. Zero, zero. The notion that those older annuities would have, they had different index strategies. They had different values because of the bonuses. They had different features. There was no analysis of that, period, ever. They admit that. I ask you to give this man his life back, and soon. I'm trying to enforce this judgment. And I would ask that you reverse this in its entirety and send a message, Your Honor. There's no published decision. You're right. You asked about decisions. That's the ironic thing about this. There are no decisions. The only person who has ever attempted to do this is the prosecutor in this case. He's done it in two cases. And I say, you need to set forth what the law is on this. So you put a stop to this. And on the attorney's fees issue, address that in reply. I didn't address that originally, so I'm not going to address it here. But we asked for that. You can't just make up rules. Make up a fraud claim. That's what happened here. Give this man his life back. Thank you, Your Honor. Gentlemen, thank you for your spirited arguments. The case is submitted. Court stands in recess until after lunch.